DECISION
Before this Court are the Defendants' motions to dismiss pursuant to Super. R. Civ. P. Rules 12(b)(1) and 12(b)(2), for lack of subject matter jurisdiction and for lack of personal jurisdiction, respectively. Also before this Court is a motion for summary judgment brought by Plaintiff Liberty Mutual Insurance Company, Inc. (Liberty).[1] In this action, Liberty has sued the two Defendants seeking indemnification for over $400,000 in fees and expenses incurred while defending a 1998 Connecticut lawsuit alleging bad faith in the handling of a workers compensation claim. The two Defendants are National Council on Compensation Insurance, Inc. (NCCI) and National Workers Compensation Reinsurance Pool (Pool).
 Facts/Travel
The Pool is an unincorporated association of insurance companies.See Compl. ¶ 3, July 12, 2002; Serv. Carrier Agr. I.[2] As a condition of writing workers compensation insurance in many states, insurers are required to provide workers compensation coverage to employers who cannot obtain such coverage in the open market. (Compl. ¶ 8.) The Pool is a mechanism for "reinsuring" insurers by allowing its members "to share in the experience of certain assigned risks, thereby reducing both administrative costs and the annual fluctuation in liability" arising from providing coverage for these "assigned risks." See 1993 Articles ¶ II.1.
Defendant NCCI serves as the "Administrator" of the Pool, as the term is defined in the 1993 Articles. (1993 Articles, ¶ II.2; Dorsey Aff ¶ 2, Dec. 5, 2002.) While the Pool has a Board of Governors which is ultimately responsible for its operations (1993 Articles ¶¶ V.l to V.12), the Administrator is responsible for transmitting all funds and communications between the parties to the various agreements, and for generally facilitating the operations of the Pool. (Reinsurance Agr. 7.)
In 1990 an employee, whose employer was insured by Liberty as an assigned risk, sued Liberty in the Connecticut Superior Court for bad faith in its handling of her workers compensation claim (Connecticut action). (Rusconi Aff. ¶ 6, Sep. 30, 2002; Hr'g Tr. 33, Cloutier v.Liberty Mut. Ins. Co.. (Conn.Super.Ct. 1998), Ex. G. to Mem. Law Supp. Pi's Obj., Oct. 2, 2002.) Liberty alleges that it is entitled to indemnification from the Pool for its expenses in defending that action under the various agreements. (Compl. ¶ 19.) Those agreements all contain similar, though not identical, indemnification clauses. For example, the 1993 Articles state:
 Any person or insurer made, or threatened to be made, a party to any action, because such person or insurer was a participating company. . . shall be indemnified against all judgments, fines, amounts paid in settlement, reasonable costs and expenses including attorney's fees, and any other liabilities that may be incurred as a result of such action, suit or proceeding" (1993 Articles, ¶ VII. 1)
Liberty's request for indemnification was denied by the Pool. (Rusconi Aff, ¶ 7).
In 1994, the Board of Governors of the Pool issued a "clarification" of the indemnification obligations of the Pool. (Compl. ¶ 21; Dorsey Aff, ¶ 7, Dec. 5, 2002; Letter of July 26, 2000 from Merritt to Rusconi, Ex. A to Def s Resp. to Pi's Obj, Nov. 8, 2002.)[3] That clarification adopted the position that Defendants now take before this Court: that costs incurred in defending a bad faith action are covered under a servicing carrier allowance "which is intended to cover a servicing carrier's expenses relating to claims handling." Dorsey Aff, ¶ 11;see, e.g., Serv. Carrier Agr. 3 ("[i]t is further understood and agreed that any loss adjustment expense shall be paid from the servicing carrier allowance unless authorization to incur such expense and to receive reimbursement for such expense is received from the Board"). Therefore, Defendants argue that Liberty has already been compensated for costs of the bad faith litigation and cannot recover twice for the same costs.
Liberty's position is that the agreements unambiguously require Defendants to indemnify Liberty, and that because the 1994 clarification was issued well after Liberty issued the policy covering theCloutier claim, it has no bearing on the indemnification claim. Defendants respond that their position was not a change in the agreements, but rather arises out of the agreements that existed in 1990.
The relationship between Liberty and the Defendants is governed by three agreements. The Pool is governed by its Articles of Agreement (Articles), which were adopted in 1970 and have been amended numerous times since then. (1993 Articles, Cover Page.) The Articles set out the basic structure[4] of the Pool, which involves relationships between two types of entity: "participating companies" and "servicing carriers."
Participating companies are the members of the Pool, and as a condition of membership are required to enter into quota-share reinsurance agreements (reinsurance agreements) with the servicing carriers. (1993 Articles, ¶ II.1) These agreements provide for pro-rata distribution, among the participating companies, of losses arising from policies issued by the servicing carriers to assigned risks. Id Servicing carriers are not necessarily members of the pool, but rather contract with the members of the Pool to issue and administer insurance policies to employers who are assigned to them.[5] Id In this manner, the "extraordinary hazards" involved in providing assigned-risk insurance policies are spread among many insurance companies.See 1993 Articles, Preamble. The various agreements and affidavits indicate that Liberty is both a servicing carrier and a participating company.
In addition to the Articles which create and govern the Pool, Liberty has signed two agreements in its capacity as a servicing carrier. The "Servicing Carrier Agreement" defines its role as a servicing carrier. Under this 1983 agreement, Liberty agrees to "process, adjust, settle, compromise, defend, litigate, and pay covered compensable loss claims" in conjunction with the workers compensation policies that it issues. (Serv. Carrier Agr. at 2.) It is also responsible for maintaining adequate reserves to pay claims, for maintaining accurate records of its activities, and for making those records available to representatives of the Pool. Id.
Finally, Liberty is also subject to the Reinsurance Agreement. (Rusconi Affidavit ¶ 3, Reinsurance Agr. 1.) Under this agreement, the participating companies agree to provide "reinsurance" of Liberty's "gross liability for [l]osses under the [p]olicies for each state, territory, and the District of Columbia and for each calendar year" on a pro rata basis. (Reinsurance Agr 1.) The Administrator acts as an agent of the participating companies for the purpose of entering into reinsurance agreements with the servicing carriers on behalf of those participating companies. (1993 Articles ¶¶ III, V.9; Reinsurance Agr. 7, Art. XXI.) It is unclear when that version of the Reinsurance Agreement was executed, though both sides agree that it governs the present dispute. See Rusconi Affidavit ¶ 3 (noting that the Quota Agreement, a.k.a. the Reinsurance Agreement, governs the relationship between the Defendants and Liberty); Dorsey Affidavit ¶ 4 (confirming that the Reinsurance Agreement governs the relationship between Liberty and Defendants).
Ultimately, this case is a dispute about the interpretation of these three agreements,[6] and specific provisions will be stated below where relevant. Liberty alleges that after again seeking reimbursement in 1999, and after exhausting all of the internal appeal procedures of the Pool, it filed its complaint in this action. (Compl. ¶¶ 20, 21.) It also alleges that its costs in defending the Connecticut suit amount to $437,349.73. Id ¶ 18.
After Liberty filed its complaint, Defendants filed motions to dismiss under Super. R. Civ. P. Rules 12(b)(1) and 12(b)(2) for lack of subject-matter jurisdiction and lack of personal jurisdiction, respectively. Liberty objected to those motions and filed its own motion for summary judgment, to which Defendants objected. This Court heard argument for the three motions together. (Ord. of Sep. 30, 2002.) Defendants have not yet answered the complaint.
 Analysis
As they question the capacity of this Court to decide the present matter, the Court must first address the Defendants' motions to dismiss for lack of subject-matter and personal jurisdiction. Then, if necessary, it will address Liberty's motion for summary judgment.
Subject Matter Jurisdiction
In support of their motion to dismiss under Super. R. Civ. P. Rule 12(b)(1) for lack of subject matter jurisdiction, Defendants argue that because the litigation giving rise to this dispute occurred in Connecticut, and because the dispute has very little connection to Rhode Island, the Court lacks subject matter jurisdiction over the two claims brought by Liberty. In addition, they argue that because Rhode Island's Rule 12(b)(1) is similar to the federal counterpart, federal court decisions are applicable in deciding the question of subject matter jurisdiction. The Court finds these arguments to be completely without merit.
The Court begins with a brief discussion of the difference between the limited original jurisdiction of a federal court and the general original jurisdiction of the Superior Court. A federal court has original jurisdiction only of actions arising under federal law,see 28 U.S.C. § 1331, or of diversity actions whose amount in controversy exceeds $75,000, see id. § 1332. A plaintiff who can meet neither of those requirements generally is not eligible to sue in federal court. However, that same plaintiff can almost always bring suit in a state court. At the state level, subject matter jurisdiction serves merely to determine which court is appropriate to hear a certain type of claim. In Rhode Island, a plaintiff can always bring suit in the Superior Court unless a statute specifically confers subject-matter jurisdiction on another of Rhode Island's courts — i.e. the family court or the district court. Barone v. O'Connell 785 A.2d 534, 535 (R.I. 2001) (noting that, as a court of general jurisdiction, the superior court "is granted subject-matter jurisdiction over all cases unless that jurisdiction has been conferred by statute upon another tribunal").See, e.g., G.L. 1956 § 8-8-3 (defining the jurisdiction of the district court); § 8-8.2-2 (defining jurisdiction of the traffic tribunal); § 8-10-3 (defining the jurisdiction of the family court).
Defendants' arguments against this Court's subject matter jurisdiction have conflated and confused the doctrines of conflicts of laws,forum non conveniens, and personal jurisdiction. The doctrine of conflicts of laws, also known as choice of law, addresses the determination of which jurisdiction's law to apply to a given dispute.See, e.g.. Biais v. Aetna Casualty Sur. Co.. 526 A.2d 854, 856 (R.I. 1987) (examining whether to apply Massachusetts or Rhode Island law to a contract for automobile insurance). Forum non conveniens is a doctrine which allows a court to dismiss an action when practical concerns dictate that another jurisdiction's forum would be more appropriate to adjudicate a particular dispute. Iragorri v. International Elevator,Inc., 203 F.3d 8, 12 (1st Cir. 2000) (noting that "[w]hen a defendant moves for dismissal on forum non conveniens grounds, it bears the burden of showing both that an adequate alternative forum exists and that considerations of convenience and judicial efficiency strongly favor litigating the claim in the alternative forum.") Finally, personal jurisdiction refers to whether a Court has the power to adjudicate a dispute with respect to a particular individual.
While all of these doctrines involve analyzing the connection between a particular person or dispute and a particular state, subject-matter jurisdiction at the state level does not.[7] In fact, it is entirely possible for two persons with absolutely no connection at all with Rhode Island to invoke the subject-matter jurisdiction of the Rhode Island courts — subject to the requirements of the three above mentioned doctrines, which may be waived. See Super. R. Civ. P. Rule 12(g), (h) (providing for waiver of defenses of personal jurisdiction and venue). Subject matter jurisdiction only involves an analysis of the competence of a given court to adjudicate a particular type of action or claim. To invoke this Court's subject-matter jurisdiction, a plaintiff need only meet the requirements of the relevant statutes, of which there are two in this case.
The first statute, the pertinent parts of which are quoted, states in broad terms the jurisdiction of the superior court:
 (a) The superior court shall have original jurisdiction of all actions at law. . . in which the amount in controversy shall exceed the sum of ten thousand dollars ($ 10,000). . . ." G.L. 1956 § 8-2-14.
Liberty's breach of contract claim clearly is an action at law which exceeds the amount in controversy requirement. A second provision governs Liberty's request for declaratory judgment:
 "The superior or family court upon petition, following such procedure as the court by general or special rules may prescribe, shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." Uniform Declaratory Judgments Act, G.L. 1956 § 9-30-1.
The Plaintiffs claim for a declaratory judgment also clearly invokes the subject matter jurisdiction of this Court under § 9-30-1.
The only contrary authority cited by the Defendants is federal case law, but the federal courts have a subject matter jurisdiction that is more limited than that of a state court. See 28 U.S.C. §§ 1331-32.[8]
Therefore, the Court will deny Defendants' 12(b)(1) motion to dismiss for lack of subject matter jurisdiction.
Personal Jurisdiction over the Pool
Counsel for the Pool has brought a motion to dismiss under Super. R. Civ. P. Rule 12(b)(2), alleging that this Court does not have personal jurisdiction over the Pool.[9] It is elementary that this Court, or any United States court for that matter, may not adjudicate the rights of persons unless it has jurisdiction over those persons. In general, whether or not personal jurisdiction exists depends both on statutory and constitutional grounds. However, Rhode Island's "long-arm" statute provides that its courts have jurisdiction up to the limits of the Due Process Clause of the United States Constitution. G.L. 1956 § 9-5-33(a);Cerberus Partners, L.P. v. Gadsby Hannah, LLP, 836 A.2d 1113, 1118
(R.I. 2003). Therefore, personal jurisdiction turns only on the constitutional analysis, which requires an analysis of whether a defendant has "certain minimum contacts" with Rhode Island "such that the maintenance of the suit does not offend `traditional notions of fair play and substantial justice.'" Id Liberty and the Pool disagree as to whether minimum contacts exist between the Pool and Rhode Island, so that the Court's exercise of jurisdiction would be consistent with Due Process requirements.
Before engaging in the analysis of whether the Pool has sufficient "minimum contacts" with Rhode Island, however, the Court must first examine the nature of the party being sued. Liberty has alleged in its complaint that the Pool is a "voluntary, nonprofit, unincorporated association with its principal place of business in New York, New York." (Compl. 1| 3.) The Pool's status as an unincorporated association is also confirmed by the Servicing Carrier Agreement. (Serv. Carrier Agr. 1.) Unlike a corporation, which the law considers to be a legal entity with the capacity to be sued in its own name, an association is recognized by Rhode Island only as an aggregation of persons and not as its own legal entity. Guild v. Allen, 28 R.I. 430, 435, 67 A. 855, 857
(1907); see G.L. 1956 § 7-1.2-302(b)(2) (allowing a business corporation to sue and be sued in its corporate name).
The capacity of a person, association, or partnership to be sued in Rhode Island courts is determined by the laws of Rhode Island. Super. R. Civ. P. Rule 17(b) (noting that a corporation's capability to be sued, however, depends upon the law of the state in which the corporation is organized). Rhode Island statutes set out the manner through which an association[10] may be subjected to the jurisdiction of this Court:
 "Any action or other civil proceeding may be maintained to recover any property or upon any cause of action for or upon which the plaintiff may maintain such an action or proceeding against all the associates, . . . against the president and secretary of the association, or the officers or members exercising substantially the duties, respectively, of president and secretary, or if there is no such officer, or officers, or members exercising such duties, or either of them, then against any other two (2) officers of the association, or if there is but one officer, then against the single officer, or if there is no officer known to the plaintiff, then against any member of the association, describing the officer or officers, member or members, as the representative or representatives of the association." G.L. 1956 § 9-2-12.
One way that a plaintiff may sue an unincorporated association is to join all members of the association as defendants. See id. However, a plaintiff also has the option to name only the president and secretary of the association, and would likely do so if it was more convenient and practical. See id. If the president and secretary are unknown, the plaintiff also has a variety of options to sue the association by naming either known officers or members as set out in § 9-2-12.
Noticeably absent from this list of options is for a plaintiff directly to name the association itself as a defendant. Several decisions confirm that an association cannot be sued in its own name.Walsh v. Israel Couture Post No. 2274 V.F.W, 542 A.2d 1094, 1095 n.l (R.I. 1988) (noting that "[a]n unincorporated association is not a proper party in a law suit under the law of Rhode Island.");Guild, 28 R.I. at 435, 67 A. at 857 (finding that the law considers associations to be aggregations of persons and not separate entities);Corrente v. Rhode Island, Dep't of Corrections, 759 F. Supp. 73, 80
(D.R.I. 1991) (noting that a plaintiff must either name every member of an association as defendant, or else name the officers under §§ 9-2-10 to9-2-15).
Because an unincorporated association is not a proper party to a lawsuit under Rhode Island law, the Court must dismiss the Pool as a defendant. The Court has raised the association issue suasponte, and it is unclear to the Court whether such dismissal is properly styled as a 12(b)(2) dismissal for lack of personal jurisdiction, a 12(b)(4) motion for insufficiency of process, a 12(b)(5) motion for insufficiency of service of process, a 12(b)(6) motion for failure to state a claim, or perhaps a 12(f) motion to strike. The question is merely academic, however. Since the Court has before it a 12(b)(2) motion for lack of personal jurisdiction, it will grant that motion, albeit for a different reason than advocated by counsel for the Pool. The reason is simple. The Court does not have a legally cognizable person before it, so it cannot have personal jurisdiction.
The Court realizes that in some sense this dismissal elevates form over substance, since in all likelihood the members and/or officers of the association will hire the same counsel who will then raise the same arguments as were raised on behalf of the association, once those officers and/or members were made defendants.[11] The Court has also considered whether it is proper to raise the issue sua sponte before giving the parties a chance to address the effect of § 9-2-12.Cf. Demers v. Adamson. 102 R.I. 453, 457 (R.I. 1967) (finding it proper for a Court to raise a failure to join indispensable parties suasponte.) However, the Court finds that the law is clear that an action cannot be maintained directly against an association, and so the Court has no other choice than to dismiss the claims against the Pool since any judgment rendered against it would be a nullity. Therefore, there is no need to consider at this time whether there are minimum contacts such that the Court would have personal jurisdiction over the Pool. If necessary and upon a proper motion, the Court will address this issue in a future proceeding with respect to any added defendants.
The Defendants sought dismissal of the Pool, albeit on different grounds, so there seems to be little prejudice to Defendants by dismissing the claims against the Pool. Moreover, a dismissal benefits Liberty as well. Liberty seeks a money judgment, inter alia, as its requested relief, and this Court could not render an enforceable judgment against the association, as opposed to the members of that association. Therefore, it is better for the Plaintiff if it is allowed to correct the situation sooner rather than later.
The Court does note, however, that it will grant Plaintiff leave to amend its complaint if Plaintiff desires to add the proper parties and if such additions would be consistent with the applicable statute of limitations and Super. R. Civ. P. Rule 15(c) (pertaining to the "relation back" of amended pleadings which add new parties).
Liberty's Summary Judgment Motion
Liberty has moved for summary judgment, on both its breach of contract and declaratory judgment claims, on the grounds that the various contracts with NCCI and the Pool unambiguously require NCCI to indemnify Liberty for the costs incurred in defending the Connecticut lawsuit. In order to find NCCI liable to Liberty for indemnification of the costs of the Connecticut lawsuit, Liberty must demonstrate two things. First, it must show that any or all of the various agreements entitle Liberty to reimbursement — in other words, Liberty must show that the costs of the Connecticut action were not loss adjustment expenses included in the servicing carrier allowance, as NCCI argues. Second, Liberty must demonstrate that NCCI — as opposed to the Pool, its Board of Governors, or its members — is a party to the particular agreement and is bound by it.
Standard of Review
Summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as [a] matter of law." Super. Ct. R. Civ. P. Rule 56(c). The Court "does not pass upon the weight or the credibility of the evidence," but instead it must consider the evidence "in a light most favorable to the party opposing the motion." Palmisciano v. Burrillville Racing Ass'n.603 A.2d 317, 320 (R.I. 1992). "If there are no material facts in dispute, the case is ripe for summary judgment." Richard v. Blue Cross BlueShield, 604 A.2d 1260, 1261 (R.I. 1992).
The Court will first address the somewhat peculiar procedural posture of this case. NCCI has not yet filed an answer, and it need not until the Court disposes, as it does in this decision, of its motion to dismiss.[12] NCCI argued in its memoranda and at the hearing that it would be improper to grant summary judgment before it has even answered the complaint and had an opportunity to conduct discovery. However, the Court disagrees and finds that it may consider a summary judgment motion, which by rule can be made "at any time after the expiration of 20 days from the commencement of the action." Super. R. Civ. P. Rule 56(a).[13]
However, the fact that no answer has yet been made makes it more difficult for Plaintiff to establish entitlement to summary judgment. If there were an answer, then the Plaintiff could rely upon any admitted allegations in order to demonstrate the absence of a factual dispute and entitlement to judgment as a mater of law. See Rule 56(c). However, the Court is hesitant to rely upon the allegations in Plaintiffs own unverified complaint — even though at times the Defendants themselves have cited to various allegations of the complaint. Only once it answered can the complaint really demonstrate the absence of factual issues, and then only to the extent that the Defendants admit its individual allegations. Therefore, while the Court has cited to the complaint for purposes of providing background for this dispute, the Court will limit its consideration only to the Rusconi Affidavit and the Dorsey Affidavit to determine whether there exist genuine issues of material fact which would preclude summary judgment.[14]
 Choice of Law
Each party has provided their view on the applicable law that governs whether a contract is ambiguous, and if so, how the Court should resolve the ambiguity. Initially, the parties focused their analysis on Rhode Island law, but later addressed Connecticut law in their post-hearing memoranda. However, it is not immediately apparent that either of the two states' law should be applied to this dispute. While the costs giving rise to the alleged indemnification obligation arose out of a Connecticut lawsuit, Liberty is a Massachusetts corporation, (Compl. ¶ 1), the Pool's principal place of business is New York (Compl. ¶ 3), and NCCI appears to be either a Florida or Delaware corporation.[15]
Rhode Island choice-of-law rules are somewhat unsettled with respect to contracts, but it appears that those rules do not place great weight on the fact that the indemnification dispute arose out of a Connecticut lawsuit. Rather, the place the contract was negotiated and signed appears to be more important in determining which state's law applies to the contracts. See Crellin Technologies v. Equipmentlease Corp.,18 F.3d 1, 5 (1st Cir. 1994) (noting that Rhode Island has not explicitly set out which of two tests — the "lex loci contractus" approach, or the "interest weighing" approach — is the proper one for choice-of-law questions in Rhode Island, but noting that the place of contracting is given great weight under either mode of analysis).
Any obligation of NCCI to pay arises out of the various contracts between and among NCCI, Liberty and the members of the Pool, and it is not clear where those contracts were executed. However, since there does not appear to be a relevant distinction between the laws of Rhode Island and Connecticut, and since the parties have only addressed those jurisdictions, for this motion the Court will assume arguendo that one of those States' law applies in determining whether the contracts in this case are ambiguous.
If there were a relevant distinction between Connecticut and Rhode Island law, the Court would have to decide whether Defendants' raising the choice of law issue in a post-hearing brief constituted "reasonable notice" sufficient to invoke Connecticut law. See Rocchio v.Moretti, 694 A.2d 704, 706 (R.I. 1997) (finding that the trial justice did not err by applying Rhode Island law where the party opposing summary judgment did not give reasonable notice in the pleadings or otherwise, pursuant to Super R. Civ. P. Rule 44.1, of the intention to seek application of foreign law). However, it appears that the result would be the same under the law of either state.[16]
 Determining Whether a Contract is Ambiguous
Under both Rhode Island and Connecticut law, a Court must look to an entire agreement, and not just isolated provisions, in order to properly construe a party's obligations. W.P. Assocs. v. Forcier. Inc..637 A.2d 353, 356 (R.I. 1994) ("In determining whether an agreement is clear and unambiguous, the document must be viewed in its entirety and its language be given its plain, ordinary and usual meaning."); UnitedIlluminating Co. v. Wisvest-Connecticut L.L.C., 791 A.2d 546, 550 (Conn. 2002) (noting that "the contract must be viewed in its entirety, with each provision read in light of the other provisions;" that "every provision must be given effect if it is possible to do so;" and that "when there are multiple writings regarding the same transaction, the writings should be considered together") (citations omitted). A contract is ambiguous when it is reasonably susceptible to more than one interpretation. W.P. Assocs., 637 A.2d at 356; United IlluminatingCo., 791 A.2d at 550.
Therefore, the Court must look to all provisions of all the applicable agreements, and not just the indemnification clauses, in determining whether the agreements are unambiguous and whether NCCI must indemnify Liberty. In doing so, the Court will address both the agency status of NCCI and any indemnification obligations established by the agreements.
1985 and 1993 Articles of Agreement
The Court will begin its analysis with the Articles of Agreement which govern the Pool. The Articles were amended in 1985, 1991, 1992, and 1993. (1993 Articles, Cover Page.) Because the Articles have been frequently amended, the Court must first address which version of the Articles is applicable. The injury giving rise to the workers compensation claim occurred in 1990. (Hr'g Tr. 13, Ex. G to Pi's Mem.; Rusconi Aff. ¶ 6). The ensuing bad-faith action against Liberty was commenced in November, 1990 and was dismissed in 1998. Id; Complaint,Cloutien v. Liberty Mut. Ins. Co., Nov. 30, 1990, Ex. F to Pi's Mem.; Rusconi Aff. ¶ 6).
Liberty relied upon the 1993 Articles in its original papers, but after oral argument, the Defendants argued that the 1985 Articles were in effect when the claim arose and should therefore govern any indemnification obligation. (Dorsey Aff, ¶ 5). Liberty responded with a memorandum that initially objected to Defendants raising the applicability of the 1985 Articles for the first time after the oral argument. Later in that memorandum, however, Liberty conceded the applicability of the 1985 Articles since it concluded that there was no substantive difference between the indemnification clauses of the different versions of the Articles. Because of that concession, because the underlying insurance policy was issued prior to the 1991 amendment, and because the suit giving rise to the costs was filed in 1990, the Court finds that the 1985 Articles should govern.
The distinction between the applicable Articles is important for two reasons. First, although the 1993 Articles delineate with some detail the role of the Administrator of the Pool as an agent of the participating companies,[17] the 1985 Articles do not mention an Administrator and make little mention of NCCI. Second, the two versions of the Articles contain slight differences in their indemnification clauses, and contrary to Liberty's assertion, those differences may be material.
It appears undisputed that NCCI is now the "Administrator" of the Pool as that term is defined in the 1993 Articles. (Dorsey Aff, ¶ 2; 1993 Articles ("The Administrator is also designated as an agent for the participating companies to enter into contracts on their behalf to carry out the purposes of these Articles including but not limited to Reinsurance Agreements.")) Therefore, NCCI could be liable for any indemnification obligation established by the 1993 Articles. However, the undisputed facts established by the affidavits and the various agreements do not speak conclusively to the relationship between NCCI, Liberty, and the Pool prior to 1993.
In fact, the 1985 Articles do not speak of an Administrator at all — instead, a "General Manager-Secretary" is invested with "general administrative authority for the direction of the Pool's business activities." (1985 Articles, ¶ VI.8 at 13.)[18] There does appear to have been some relationship between NCCI and the Pool prior to 1993. For example, in order to be a member company under the 1985 Articles, a company must "subscribe to the services of [NCCI,] either by being a member of NCCI or by subscribing to the services of NCCI for all states in which the company is or becomes a member of the [Pool.]" (1985 Articles, ¶ III.1 at 5.) Similarly, the President of NCCI is given the status as "ex-officio member without vote" of the Board of Governors of the Pool. Id 1| V. 1 at 10. However, neither of these provisions indicates that NCCI is bound on any indemnification obligation that may exist, even if the Pool's members or Board of Governors were so bound. Therefore, the Court finds that without having before it further indication of the scope of NCCI's relationship to the Pool prior to 1993, there is an insufficient basis for finding liability against NCCI on the basis of the 1985 Articles alone.[19]
 The Servicing Carrier Agreement and the Reinsurance Agreement
Although the Articles do not conclusively establish Liberty's entitlement to indemnification from NCCI, Liberty has also entered into two contracts in its capacity as a servicing carrier for the Pool on which NCCI may be liable. By entering the Servicing Carrier Agreement, Liberty has contracted to provide workers compensation insurance to "assigned risk" employers. See Serv. Carrier Agr. at 3-4 (noting that the servicing carrier is an independent contractor of the pool). Similarly, the Reinsurance Agreement provides for the distribution of the risk of becoming a servicing carrier among the members of the Pool.
Several features of the two agreements are noteworthy. The first is the indemnification clauses. The Servicing Carrier Agreement merely incorporates the indemnification clause of the Articles. (Serv. Carrier Agr. 4.) As noted above, the 1985 Articles would apply. That indemnification clause states:
 "1. Indemnification. Any person or insurer made or threatened to be made a party to any action, suit or proceeding, because such person or insurer was a member, or a servicing carrier, or served on the Board of Governors or other committee or was an officer or employee of the [National] Pool shall be indemnified against all judgments, fines, amounts paid in settlement, reasonable costs and expenses including attorney's fees and any other liabilities that may be incurred as a result of such action. . . ." (Dorsey Aff, ¶ 5 and Ex. A.) (Emphasis added.)[20]
Similarly, the Reinsurance Agreement provides an indemnification clause which is similar in all material respects to the above cited clause. (Reinsurance Agr. 7.) Given this broad language, it appears that Liberty is entitled to indemnification for the costs of the Connecticut action. By focusing on this language alone, it appears that Liberty would be entitled to indemnification for all of the costs of its involvement in any suit or any proceeding, even those within the ordinary course of its business as an insurer in the workers compensation system.
Other features of the two agreements cast doubt on whether the indemnification clause has such a broad reach, however:
 "The Servicing Carrier may act generally in the name of the Pool including bringing and defending lawsuits in the ordinary course of business as a Servicing Carrier in the Pool's name, unless otherwise instructed by the Board.
 It is further understood and agreed that any loss adjustment expense shall be paid from the servicing carrier allowance unless authorization to incur such expense and to receive reimbursement for such expense is received from the Board." (Serv. Carrier Agr. 3.) (Emphasis added.)
Likewise, the Reinsurance Agreement provides that
 "the Servicing Carrier solely shall be liable for the loss adjustment expenses incurred in connection therewith and shall not be entitled to any recoveries of such expense except for those loss adjustment expenses not covered by the Servicing Carrier Allowance. . . which are normally reimbursed to servicing carriers pursuant to the Articles." (Reinsurance Agr., ¶ VIII.A. at 4.)
The Court must consider how the indemnification clauses interact with the "loss adjustment expense" clauses. A reasonable construction is that servicing carriers are compensated for all costs, but while many costs are separately indemnifiable, costs which are also loss adjustment expenses are compensated only through the servicing carrier allowance and not from separate reimbursement. It appears to the Court, then, that these clauses may exclude the costs of at least some suits and some proceedings from the reach of the indemnification clause in spite of its broad language, because the expenses of some of those suits and proceedings will also be loss adjustment expenses. The problem is that neither agreement defines either the servicing carrier allowance or loss adjustment expense, so it is unclear whether costs in defending a bad faith action are loss adjustment expenses.[21] This is an ambiguity which calls for extrinsic evidence.
Defendants have provided a 1999 document which describes the types of costs which are separately indemnified and which costs are loss adjustment expenses included within the servicing carrier allowance. (Dorsey Aff, ¶ 11 and Ex. D.) Likewise, the Defendants have relied on the Board of Governors' "clarification" of the indemnification obligation created by the various agreements. (Ex. I to Mem. Law Supp. Pi's Obj. (noting that the Board determined in 1994 that costs in defending bad-faith claims were compensated through the servicing carrier allowance)). Unfortunately, the clarification was issued in 1994 and the document indicates it was created in 1999, so while they may reflect current policy, they cannot be conclusive on the issue of whether Liberty's costs are properly categorized as a loss adjustment expense, within the servicing carrier allowance, as those terms were understood in 1990.
In spite of its reliance on post-1990 evidence, the Dorsey Affidavit is sufficient to demonstrate that a genuine issue of material fact exists, because it illustrates that the two terms require further definition than is given in either the Servicing Carrier or Reinsurance Agreements. Moreover, Liberty has not provided any extrinsic evidence of its own to demonstrate entitlement to judgment as a matter of law. Liberty's claim that it is entitled to summary judgment rests entirely on the indemnification clauses, and ignores the other clauses in the agreements. See W.P. Assocs., 637 A.2d at 356 (noting that if a "document is susceptible to more than one interpretation, extrinsic evidence is admissible to aid in its interpretation"); Foley v.Huntington Co., 682 A.2d 1026, 1040 (Conn.App.Ct. 1996) (noting that when a court is confronted with a contract "containing inconsistent clauses. . . [a]ll relevant evidence is admissible on the issue of contract interpretation"). In light of the two sets of clauses, Liberty's motion must fail.
Either position might ultimately prevail because both Liberty and NCCI have set forth reasonable interpretations as to whether the costs of defending a bad faith action are loss adjustment expenses, but that issue cannot be resolved merely by reference to the agreements themselves. Therefore, they are ambiguous and extrinsic evidence is required to ascertain the meaning of the terms "loss adjustment expense" and "servicing carrier allowance" as understood in 1990.
Even if the contracts ultimately entitled Liberty to indemnification, however, the Court still would not grant summary judgment against NCCI at this stage. Like the 1985 Articles, the Servicing Carrier Agreement does not mention NCCI or an Administrator. That agreement was signed in 1983 by a person[22] whose title was given as "General Mgr" of the Pool.[23] (Servicing Carrier Agreement 7.) While this "General Mgr" may have been an employee of NCCI whose signature could bind NCCI, this has not been shown. It is equally plausible that this person was unaffiliated with NCCI and that his acts instead bound the members of the Pool, through their Board of Governors, but not NCCI. Therefore, the Servicing Carrier Agreement is insufficient to impose liability on NCCI.
The Reinsurance Agreement does make repeated reference to the Administrator, and Defendants have admitted that NCCI is the Administrator of the Pool, at least under the 1993 Articles. (Dorsey Aff, ¶ 2.) However, that agreement also makes it clear that the Administrator is merely an agent "for the purposes of entering into and administering the provisions of this [Reinsurance] Agreement," and its obligations are governed by an Administration Agreement. (Reinsurance Agr. I.)[24] As a general rule, "an agent [working] on behalf of a disclosed principal is not personally liable to a third party for acts performed within the scope of the [agent's] authority." Stebbins v.Wells, 818 A.2d 711, 719 (R.I. 2003) (citations omitted, brackets in original). So while an agent may become liable for acts outside of the scope of his authority, or for acts on behalf of an undisclosed principal, Liberty has not identified any applicable theory under which NCCI may be liable. While it is possible that NCCI is personally bound on some indemnification obligation, perhaps through its Administration Agreement, this also has not been shown. See C. C. Plumb Mixes. Inc. v.Stone. 108 R.I. 75, 77 (R.I. 1971) (finding that agent's liability can be established if, in addition to the agency relationship, the agent impliedly or expressly agreed to be bound personally). For these reasons, the Court finds that the Reinsurance Agreement also fails to establish that NCCI is liable for indemnification, even if the agreement does require some party to indemnify Liberty.
Genuine Issues of Material Fact Remain
For the reasons expressed above, the Court finds that there are multiple issues of material fact in the chain of inferences necessary to impose liability on NCCI at this stage. The Servicing Carrier Agreement does not define whether costs of defending a bad faith claim are loss adjustment expenses to be included in the servicing carrier allowance, and it is not clear that NCCI is even bound by the Servicing Carrier Agreement. The Reinsurance Agreement suffers from the same ambiguity, and it is unclear whether the version of that agreement provided by Liberty was in effect in 1990. It has been often said that summary judgment is "a drastic remedy and should be cautiously applied." Fortunato, Hon. Stephen J., Jr., Summary Judgment in Rhode Island: Is ItTime to Wrap the Mantra in Celotex?, 2 Roger Williams U. L. Rev. 153, 155 n. 3 (1997) (collecting cases). Therefore, because of the multitude of disputed factual issues, the Court must deny Liberty's motion for summary judgment.
 Conclusion
After due consideration of the arguments advanced by counsel at oral argument and in their memoranda, the Court denies Defendants' motions to dismiss the claims, pursuant to Rule 12(b)(1), for lack of subject matter jurisdiction. The Court will grant the motion to dismiss the claims against the Pool, pursuant to Rule 12(b)(2), for lack of personal jurisdiction; however, the Court will grant Plaintiff leave to amend its complaint to add additional parties.
The Plaintiff is directed to file any amended complaint within 20 days from entry of the order denying NCCI's 12(b)(1) motion. The Court will also extend NCCI's time to file an answer to 30 days from entry of the order. However, if the Plaintiff joins additional parties to this action, then NCCI may have until the deadline applicable to those parties for service of an answer so that it may file a joint answer if the parties desire.[25]
The Court will deny the Plaintiffs motion for summary judgment against the Pool, because it is moot in light of the Court's decision to dismiss the claims against the Pool. The Court will deny Plaintiffs motion for summary judgment against NCCI.
Counsel may present an order consistent herewith after due notice to counsel of record.
[1] Following oral argument, Liberty withdrew its request for summary judgment on the amount of damages, and now seeks summary judgment on only the liability portion of its claim. Therefore, their motion is now more accurately described as a motion for partial summary judgment and the Court will treat it as such pursuant to Super. R. Civ. P. Rule 56(d) (relating to cases not fully adjudicated on motion).
[2] The Court makes repeated reference to the 1993 Articles of Agreement (1993 Articles), the Servicing Carrier Agreement (Serv. Carrier Agr.) and the Quota-Share Reinsurance Agreement (Reinsurance Agr.). These are found, respectively, at exhibits C, D, and E to Mem. Law Supp. Pi's Obj., Oct. 2, 2002. See Rusconi Aff. ¶ 3, Sep. 30, 2002 (noting that these agreements govern Liberty's relationship with Defendants.)
[3] Defendants' initial memorandum attached many exhibits without an affidavit which would provide a foundation necessary for the Court to consider them under Super. R Civ. P. Rule 56(a) (noting that affidavits shall set forth facts as would be admissible in evidence, and that affidavits referring to documents shall include sworn copies of those documents). However, the Dorsey Affidavit, filed after oral argument, has cured most of those defects.
[4] It appears that the structure of the Pool has changed since its original adoption, and that change has ramifications for the outcome of this case. For purposes of providing background, the Court describes the structure outlined in the 1993 Articles, but prior to 1993 that structure may have been different.
[5] It is unclear from the record whether a company must be a "participating company" in the Pool in order to be a servicing carrier.
[6] The 1993 Articles also provide for an "Administration Agreement" between the Administrator and the participating companies. That Administration Agreement has not been provided for the Court's consideration.
[7] At the federal level, however, whether a court has diversity jurisdiction depends on whether two citizens of different states are parties to the dispute. See 28 U.S.C. § 1332.
[8] Defendants reliance on Thompson Trading, Ltd. v. Allied LyonsPLC, 123 F.R.D. 417 (D.R.I. 1989), is misplaced. In that case, the Court only addressed subject-matter jurisdiction to note that no true controversy over subject-matter jurisdiction existed because the federal court "clearly has subject matter jurisdiction over the instant controversy arising out of a Rhode Island contract, concerning interference with assignment of Rhode Island contract rights, and affecting a Rhode Island plaintiff and party to the contract. Id at 420-421. The court's passing treatment of the issue makes it impossible to determine why it analyzed the contacts with Rhode Island with respect to subject matter jurisdiction. However, the quoted text is dicta, is not binding precedent on this Court, and it addresses federal subject-matter jurisdiction which is distinct from state level subject-matter jurisdiction.
[9] NCCI joined only in the motion to dismiss for lack of subject matter jurisdiction, and apparently does not dispute that this Court may exercise jurisdiction over its person. By not raising the personal jurisdiction defense in its first Rule 12 motion, NCCI has waived that defense. See Super. R. Civ. P. Rules 12(g) and (h).
[10] An association is defined as "[a]ny unincorporated organization of persons, except a partnership, within the meaning of §§ 9-2-11 — 9-2-15." Section 9-2-10.
[11] The Pool and NCCI are represented by the same counsel in this case.
[12] Under Super. R. Civ. P. Rule 12(a)(3)(A), a defendant need not answer until 10 days from notice of the Court's disposition of its motion to dismiss under Rule 12.
[13] Though a Court may consider a Rule 56 motion at this early stage, it has flexibility in the way it disposes of the motion. Under Rule 56(f), the Court has the discretion to either continue or deny the motion where good cause exists for the opposing party's failure to produce affidavits demonstrating the existence of a disputed issue of fact. However, the Court need not consider whether Defendants have shown good cause because they submitted an affidavit following the hearing, and the Court finds that it creates a genuine issue of material fact.
[14] The Court may also consider the 1993 Articles, the Servicing Carrier Agreement, and the Reinsurance Agreement, as the affidavits demonstrate that no dispute exists as to the authenticity and relevance of those agreements. See Rusconi Affidavit, ¶ 3; Dorsey Affidavit, ¶ 4.
[15] Plaintiff alleged that NCCI was a Delaware corporation, (Compl. ¶ 2), but NCCI alleged in its memoranda that it is actually a Florida corporation.
[16] Because the Court denies Liberty's motion, and because of the possibility of additional parties being joined, the Court will not conclusively decide here which State's law applies, but it notes the possibility that neither Connecticut nor Rhode Island law properly applies. Going forward, the parties are urged to consider this issue and to attempt to reach a stipulation as to the applicable law.
[17] For example, the 1993 Articles state that the
 "relationship between the Servicing Carriers and the participating companies shall be administered by such organization as provided for in a separate administration agreement. . . ." (1993 Articles, ¶ II.1.)
[18] The 1985 Articles are found at Ex. J. to Liberty's Resp. to Def's Supp. Mem, Dec. 17, 2002.
[19] The 1985 Articles are referenced in the Dorsey Affidavit, but only the indemnification clause is included with the affidavit. The Court here relies upon the full version of the 1985 Articles, which was attached to Liberty's memorandum, although it lacks an affidavit which would provide a foundation for the document. Since Liberty submitted the document, since its veracity has not been challenged, and since the Court relies on it to deny Liberty's motion, the Court will consider it for the purpose of demonstrating the lack of evidence supporting NCCF s obligation under the 1985 Articles.
[20] By contrast, the 1993 Articles provide only for indemnification of insurers sued because they were "participating companies," and not for indemnification of insurers sued because they were servicing carriers. Cf. 1993 Articles, ¶ VII. 1.
[21] The Reinsurance Agreement provides that the "[reinsurers shall allow" a servicing carrier allowance "as established by either the Administrator or Plan Administrator." (Reinsurance Agr. 5.) Therefore, it is unclear what is actually included within that allowance and it seems to depend on evidence outside of the agreement.
[22] This person's first name appears to be "Thomas," but the last name is illegible.
[23] This is consistent with the structure of the 1985 Articles, which makes no mention of an Administrator or NCCI, but instead confers administrative responsibility on a "General Manager-Secretary." (1985 Articles.)
[24] It is unclear to the Court that the Reinsurance Agreement provided by Liberty was actually in effect in 1990. Given its parallels to the arrangement created by the 1993 Articles, and its dissimilarity to the 1985 Articles, a reasonable inference at this stage is that the Reinsurance Agreement was executed concurrently or after the 1993 Articles. See Indemnification Procedures 6.1, Ex. D. to Dorsey Aff. (noting that a version of the Reinsurance Agreement was adopted on January 1, 1993)).
[25] If there are multiple parties joined, and therefore multiple deadlines for answering based on the various dates of service, NCCI may have until the latest of the deadlines applicable to any newly joined parties to serve its answer.